# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2297-17T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

S.S.-H.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.S.
and AM.S.,

      Minors.

_____

          Submitted January 29, 2019 – Decided February 20, 2019

          Before Judges Yannotti, Rothstadt and Gilson.

          On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0162-16.

Joseph E. Krakora, Public Defender, attorney for appellant (Carol A. Weil, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Ellen L. Buckwalter, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Nancy P. Fratz, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant S.S-H. appeals from the Family Part's January 5, 2018 guardianship judgment and order terminating her parental rights to AM.S. (Anne Marie) and A.S. (Amy),[1] who were nine and seven years old respectively at the time of the guardianship trial. Defendant contends that plaintiff, the Division of Child Protection and Permanency (Division), failed to prove by clear and convincing evidence the third and fourth prongs of the statutory best interests of the child test, N.J.S.A. 30:4C-15.1(a)(3) and (4). She asserts that the Division did not "appropriately consider[]" "alternatives to termination and adoption," especially placement with relatives as required by N.J.S.A. 9:6B-4(b), and the

---

[1] To protect privacy interests and for ease of reading, we use initials and fictitious names for the parents and children. R. 1:38-3(d)(12).

Division failed to provide her with "trauma focused therapy [as] recommended by [its] own expert," and "failed to prove that termination of parental rights would not do more harm than good." We find no merit to defendant's arguments and affirm substantially for the reasons stated by Judge Anthony V. D'Elia in his comprehensive oral decision placed on the record on January 5, 2018, as supplemented by his August 28, 2018 written decision issued after our earlier remand.[2]

Defendant is the biological mother of Anne Marie and Amy.[3] Although the Division provided paternity testing, the identity of the children's father was never established.

The Division first became involved with defendant in 2005 due to unfounded reports that her drug use and mental instability were endangering her

---

[2] After the appeal was filed, we granted the Law Guardian's motion for a limited remand to supplement the record, directing the trial judge to address whether plaintiff proved that it considered alternatives to termination of parental rights (TPR) as required under N.J.S.A. 30:4C-15.1(a)(3). We consider defendant's appeal to include the judge's August 24, 2018 and August 28, 2018 orders addressing that issue after remand.

[3] Defendant also has two older children who are not subjects of the present appeal and who reside with their father, J.H. (Jack). Jack is defendant's former husband and is not a party in this case.

A-2297-17T1

older children.[4]  The Division became involved with Anne Marie in 2010, when it received a report from defendant's mother on April 14, 2010, alleging that defendant behaved erratically, abused drugs on a daily basis, was bipolar, and did not take medication for her condition.  It became involved with Amy when at her birth, she tested positive for cocaine and defendant admitted using that drug two months earlier while pregnant.

Defendant has long-standing problems with drug addiction and mental health issues that have led to her involvement in domestic violence, violent and criminal behaviors, incarcerations, multiple psychiatric hospitalizations, and an inability to maintain safe and stable housing or otherwise provide for her two young children.  During the course of multiple child welfare litigations, the Division on its own and in accordance with court orders offered numerous services to defendant to address her issues.  Defendant, however, rarely complied or successfully completed any programs to treat her addiction or her mental health issues in order to maintain care and custody of her children.  As a result, since Amy's birth, the children have spent limited time in their mother's care and, instead, were subjected to years of multiple out-of-home placements.

---

[4]  In 2008, it closed defendant's case after the physical custody of her two oldest children was transferred to their father Jack.

A-2297-17T1

They are now in the physical custody of a resource family who wishes to adopt them.

In its attempt to provide services to defendant, the Division arranged for numerous psychological, psychiatric, and bonding evaluations of defendant and the children. Dr. Robert Kanen, a psychologist, conducted multiple evaluations and testified for the Division about his findings at trial. It was his opinion that defendant suffered from substance abuse issues and a history of bipolar disorder that impaired her ability to care for her children and to provide them with a safe and secure home. Kanen's reports indicated that at times during the litigation, defendant was making some progress in addressing her issues. However, Kanen's reports continually stated that defendant remained at risk of relapse, was experiencing severe psychiatric problems, and could not provide the children with a safe, stable, or secure home. Nevertheless, in the months just before trial, Kanen withheld a recommendation of TPR and instead suggested defendant engage in more services.

In his final report, and despite the Division offering the recommended services, Kanen concluded that defendant could not provide the children with a permanent, safe, and secure home because her problems were chronic in nature. At that time, Kanen found that the earlier improvements defendant displayed

during her preceding evaluation had diminished and that her cognitive abilities had deteriorated. He noted that defendant was hostile, uncooperative, and unable to regulate her emotions. He also stated that defendant reported to him that she had tested positive for cocaine and marijuana and expressed a desire to resume her use of PCP. Kanen concluded that the reunification of defendant with the children would expose them to an unnecessary risk of harm.

Dr. Charles E. Daly, another psychologist, also performed evaluations and testified for the Division at trial. He, too, issued a report early on that was somewhat optimistic about defendant's progress. Daly was primarily concerned about defendant's mental health and addiction to drugs. Based on personality testing, he found defendant demonstrated signs of anxiety, depression, paranoia, and mania. She also displayed symptoms of schizophrenia, borderline personality disorder, antisocial behavior, and suicidal ideation. He concluded that defendant could not safely parent the children in a productive environment. According to the doctor, defendant's prognosis was "very poor" regarding her ability to parent the children due to her drug use and mental health problems. He believed that defendant's ability to change and improve given her history and assessments was "slim to none."

6

In one of his reports, Daly stated that defendant was in need of "trauma focused therapy," which meant that a person with defendant's experiences should receive psychotherapy that included trauma therapy, but defendant did not need "trauma focused therapy" to achieve stability. He confirmed that he had not seen records from defendant's therapists that reflected their attempts to address defendant's trauma and her refusal to discuss the issue. In any event, he stated that the therapy the Division referred defendant to over the years was "perfectly fine," and while the therapy that defendant needed was available to her, she did not benefit from the services.

Dr. Larry E. Dumont, a psychiatrist, also conducted multiple evaluations of defendant and testified for the Division as to his findings. He recommended that the Division move towards TPR and adoption. Dumont confirmed that defendant suffered from bipolar disorder. The doctor found that defendant displayed a lack of ownership of her mental health issues and blamed others for her problems. He observed that she specifically blamed the Division for her shortcomings when her inability to complete treatment was due to her non-compliance with the recommended therapies for bipolar disorder. Dumont explained that if defendant experienced a drug relapse, she would not be able to safely parent the children.

A-2297-17T1

Kanen also conducted bonding evaluations between the girls and their resource parents and with defendant. He observed that at that time, because the children had only been briefly involved with the resource parents, it was too soon to determine if they had developed a secure attachment. He noted that Anne Marie referred to her resource parents as her mother and father. The children were comfortable and interactive with the resource father and while the children were less interactive with their resource mother, she was more structured and involved with teaching the children. He observed that the resource mother was knowledgeable about learning problems and well-educated. Kanen had no concerns about the resource parents' abilities to meet the needs of the children. He concluded that the children were in the process of forming an attachment and seemed desperate to want the resource parent to be their parents.

Kanen also noted that for their part, the resource parents wanted to adopt the children. The resource parents could provide the children with stability and permanency. According to Kanen, the children needed a permanent home and the resource parents could meet their needs. If the children were removed from the resource parents, it would affect them negatively and impact their sense of permanency.

A-2297-17T1

As to their bonds with defendant, Kanen observed that during the evaluation, defendant was initially calm but withdrawn from the children, although she eventually became irritable. Kanen found that the children had an insecure attachment to her and that she was not capable of providing the children with a permanent, safe, or secure home. He concluded that while the children were comfortable with defendant, their bond remained insecure. Also, if the children were permanently separated from defendant, they would have a brief separation reaction, but the resource parents could help mitigate any harm.

Daly also performed a bonding evaluation between defendant and the girls. Daly observed that neither child initiated affection with defendant and that defendant became irrationally angry with one of the girls for asking to use the bathroom. Daly concluded that the children needed stability, love, and predictability and that it would be "unprofessional and irresponsible" for him to recommend reunification of the children with defendant because it would be "irresponsible and dangerous."

Defendant's expert, Andrew P. Brown, III, a psychologist, also performed a bonding evaluation between defendant and her children and testified for defendant. He believed that the children showed an emotional attachment to defendant because they were happy to see her and stayed in close proximity to

9

her. Moreover, they played with her and showed her affection. When defendant left the room, the children wanted to still be with defendant, which indicated to Brown that there was an emotional attachment. Overall, he believed that if the parental relationship were terminated, that the children would suffer severe harm including potential social, emotional, personality, behavioral, and mental health problems. He did not support TPR because of the harm that would befall the children. However, Brown could not state that defendant should be reunited with the children. He suggested that defendant continue to visit with the children until they reach adulthood, but at the same time, he did not reject the notion that the children should be placed in a permanent and stable home.

Brown did not perform a bonding evaluation between the girls and their resource parents. However, he explained that a relationship with a natural parent cannot be replaced and that a child's connection with a natural parent is "deeper."

At the ensuing guardianship trial, in addition to Drs. Kanen, Daly, and Dumont, the children's resource mother and the Division's Family Services Specialist, Jasmine Soto, testified. Soto described the Division's involvement with the family over the years and identified the numerous services offered to defendant in an effort to enable her to safely parent her children. She also testified as to how the Division explored alternative placements with multiple

A-2297-17T1

family members, including defendant's mother and friends of the family that included Jack's parents, prior to seeking TPR. Defendant did not testify, but called Brown as her only witness.

After considering the testimony and other evidence adduced at the trial, Judge D'Elia found that the Division had proven all four prongs of the best interests test, N.J.S.A. 30:4C-15.1(a), by clear and convincing evidence and that TPR was in the children's best interests. In his January 5, 2018 oral decision, the judge reviewed the applicable case law and explained that while substance abuse or mental health issues alone do not require TPR, defendant's inability to address and overcome her issues prevented her from providing the children with a safe and stable home. The judge delineated the numerous placements throughout the years that the children experienced and he rejected Brown's suggestion that the children's placements be continued to adulthood because they needed and were entitled to permanency in their lives now.

Addressing the third prong of the best interests test, the judge considered defendant's contention that she was never offered the recommended "trauma focused therapy." He observed that there was no proof that during her years of being offered therapy, that type of treatment was not included. To the contrary, the judge found that the issue of her trauma had been raised with defendant and

11

rejected by her. Quoting from notes from one of defendant's therapists, the judge found that her treatment included addressing "her past trauma and assess[ing] parenting skills," but that defendant expressed to the therapist that she did "not wish to . . . talk about it." The judge also cited to additional instances where "[d]efendant has been dismissive of her trauma history." Moreover, he found that even if it was not offered, based on defendant's history of noncompliance and terminating her participation in services, there was no likelihood the specific therapy would have enabled her to care for her children.

Turning to the fourth prong, the judge explained why he found Brown's opinion incredible and concluded that TPR would not do more harm than good. He found that based on the Division's experts' opinions, "the children's best interests [were] served by completely terminating the children's relationship with . . . [d]efendant[] now [as] they can't be . . . reunified . . . with [d]efendant now or any time in the foreseeable future."

After our remand, the judge issued a written decision explaining why he found that the Division proved the third prong's requirement that the Division explore alternatives to termination. He stated that based upon the caseworker's and resource parents' uncontroverted testimonies, the Division explained and explored the possibility of Kinship Legal Guardianship (KLG) with the resource

12

parents under N.J.S.A. 3B:12A-1 to -7, and he was satisfied that the parents understood what KLG meant and that they made an informed decision in favor of adoption.

On appeal, our review of the trial judge's decision is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). We defer to the Family Part's expertise, id. at 412, and afford "great deference . . . to the Family Part's findings of fact and conclusions of law based on those findings." N.J. Div. of Child Prot. and Permanency v. A.S.K., __ N.J. Super. __, __ (App. Div. 2017) (slip op. at 23), aff'd o.b., __ N.J. __ (2019). "We will not disturb the family court's decision to terminate parental rights when there is substantial credible evidence in the record to support the court's findings." Id. at __ (slip op. at 37) (quoting N.J. Div. Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)).

After reviewing the record, we conclude that Judge D'Elia's factual findings are fully supported by the record and, in light of those facts, his legal conclusions as to the best interests of the child test are unassailable. We find defendant's arguments to the contrary to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

13